ALLEN v. KROGER GROCERY & BAKING CO.

1. Brokers—Leasehold Interest—Commissions—Revocation of Agency—Termination by Operation of Law.

Lessee's agreement with broker to pay latter a commission for handling balance of term of its lease in the event that a deal were consummated, which agreement did not specify an expiration date, was not terminated by operation of law where it appears lessee's interest was disposed of through the broker's efforts slightly over a year later without the agency contract having been revoked.

2. SAME—LEASEHOLD INTEREST—COMMISSIONS—BENEFIT TO DE-
FENDANT.

Broker's efforts to dispose of lessee's unexpired term under a
lease for years by way of sublease which had to have ap-
proval of lessor that resulted in a new lease direct with the
lessor entitled broker to commission for the deal since the
benefit to the former lessee, defendant, was as much, if not
more than it would have been had it negotiated a sublease.

3. APPEAL AND ERROR—FINDING OF COURT—NONJURY LAW CASE—
PREPONDERANCE OF EVIDENCE.

In cases tried without a jury the trial judge is the trier of the
facts and may give such weight to the testimony as in his
opinion it is entitled to and his finding will not be reversed
unless the evidence clearly preponderates in the opposite direc-
tion.

4. SAME—EXCLUSION OF EVIDENCE—BROKERS—COMMISSION.

In broker's nonjury action for commission for disposal of
balance of term of defendant's leasehold interest, latter's con-
tention that there was error in trial judge's exclusion of evi-
dence *held*, without merit.

Appeal from Wayne; Callender (Sherman D.), J.
Submitted October 10, 1944. (Docket No. 67, Calen-
dar No. 42,793.) Decided November 30, 1944.

Assumpsit by Irving N. Allen against Kroger
Grocery & Baking Company, an Ohio corporation,
for commissions as a real-estate broker. Judgment
for plaintiff. Defendant appeals. Affirmed.

*Kenneth M. Stevens,* for plaintiff.

*John P. O'Hara,* for defendant.

STARR, J. Plaintiff, a duly-licensed real estate
broker, sued defendant Kroger Company for a com-
mission in connection with the leasing of a ware-
house building. The trial court, sitting without a

jury, entered judgment of $2,136.27 for plaintiff, from which defendant appeals.

In November, 1930, defendant (herein referred to as Kroger) had leased a warehouse building at 120 Green street, Detroit, from the Green Real Estate Company (herein referred to as realty company) for a 15-year term expiring in November, 1945, at a rental of $1,450 a month, the provisions of which lease prohibited Kroger from assigning or subletting without the written approval of the lessor. In 1939 Kroger ceased to use the warehouse for its own purposes and desired to sell the lease or sublet the premises for the balance of the term. About February, 1941, plaintiff interviewed C. A. Smith, manager of Kroger's real estate department, and was informed that it would sublease for the balance of its term at a rental of $1,250 a month and would pay him a commission if he found a tenant. On March 19, 1941, at plaintiff's request, defendant wrote him as follows:

"Re: Warehouse at 120 Green street.   *   *   *

"Pursuant to our telephone conversation as of yesterday, I wish to advise you that the proposition I made on the warehouse at the above location, for the unexpired term of our lease; i. e., November 14, 1945, of $1,250 per month, payable monthly in advance, is subject to the final approval of our board of directors and with the understanding that your tenant is subject to the approval of the Green Realty Company.

"Delivery of same to be made immediately and in the event the deal is consummated, we will assure you of the legal rate of commission for handling the matter.

"Very truly yours,
"THE KROGER GROCERY & BAKING Co.,
"Real estate manager."

With the consent of Kroger, plaintiff on several occasions showed the property to the Great Atlantic & Pacific Tea Company (herein referred to as A. & P.). When showing the property, he obtained the keys either from the realty company or from Kroger. He obtained blueprints of the building and information regarding light and power costs from Kroger and submitted the same to A. & P.; he had a number of interviews with Smith of Kroger and with representatives of A. & P., and during the spring and summer of 1941 continued his efforts to lease the property to A. & P. In August plaintiff informed Kroger that A. & P. did not consider the building adequate for its needs, but that it was continuing to look for warehouse space. Plaintiff testified that he thereafter continued his efforts to rent the warehouse to A. & P. and that, between August, 1941, and about April 15, 1942, he communicated with and had a number of interviews with A. & P.'s operating superintendent, Mr. Cairns, and with other representatives of A. & P. His testimony in that regard is substantially corroborated by that of Mr. Cairns. Plaintiff further testified, in substance, that during such period he had several interviews with Smith of Kroger regarding leasing to A. & P., but such testimony was disputed by Smith. However, Smith admitted that ''he (plaintiff) was in touch with me two or three times between the 15th of March and the middle of April, 1942.'' After August, 1941, Kroger obtained propositions from one or more concerns desiring to subrent the warehouse for the balance of its lease term, but the realty company (lessor) refused approval of subleases to such prospective tenants, and trouble arose between them over such refusals.

It appears that A. & P. was continuing to look for warehouse space, which was becoming scarce be-

cause of wartime conditions. In March, 1942, plaintiff again contacted A. & P. and informed Cairns, its operating superintendent, that Kroger was considering a proposition to lease the warehouse to other parties and that A. & P. should act promptly if it wanted the building. On March 18th, at Cairns' suggestion, plaintiff wrote A. & P. giving detailed information regarding the Kroger warehouse and that the rent would be increased to $1,450 a month. Plaintiff testified that Smith of Kroger had informed him that it had a prospective tenant who would rent the property at $1,450 a month. Cairns immediately took plaintiff's letter of March 18th to Mr. O'Donnell, vice-president in charge of A. & P.'s operations in that area. O'Donnell instructed Cairns to see the manager of the realty company and negotiate a lease of the warehouse. On April 8, 1942, plaintiff wrote Kroger as follows:

"The A. & P. Food Company notified me yesterday that they have decided to take the Green avenue property which you have under lease for the balance of your term. It, however, has taken the turn of their making a lease direct with the Green Realty Company, probably on a year-to-year basis, and with you, presumably, entirely out of the picture as far as continued obligation goes. I have assumed, of course, that this procedure would be acceptable to you, in fact, more acceptable than that one which we have had in mind up until the last few days, namely, a sublease under your tenancy. The board rate of commission to apply the same as if it were to be a sublease under your tenancy.

"I will try to be at your office Thursday morning for a further discussion if that is necessary."

It appears that about March, 1942, A. & P. had advertised for warehouse space, and Mr. Thierwechter, the manager of the realty company, saw such

advertisement and contacted A. & P.   There was testimony indicating that O'Donnell and Thierwechter had previously discussed this warehouse property.   As a result of direct negotiations between the realty company and A. & P. and Kroger, a deal was made about June 1, 1942, whereby the realty company leased directly to A. & P., and Kroger was discharged from all liability for the balance of its lease term.

On June 9, 1942, plaintiff rendered Kroger statement for a commission of $1,921.25, which was determined at the rate established by the Detroit Real Estate Board on the amount of rental for the unexpired term of the Kroger lease.   Kroger refused to pay the claim, and the present suit resulted.   The trial court entered judgment of $2,136.27 for plaintiff, which included interest on the commission claimed.   Defendant appeals from such judgment.

Defendant denies plaintiff's right to a commission on the grounds, (1) that its agreement, as embodied in its letter of March 19, 1941, terminated at the expiration of a reasonable time by operation of law; (2) that in any event its agreement was terminated when A. & P. rejected the warehouse as unsatisfactory for its needs about August, 1941; and (3) that plaintiff rendered no services which would entitle him to a commission.

The record is convincing that plaintiff, with Kroger's approval, continued his efforts to secure A. & P. as a tenant of the warehouse property and that his efforts resulted in the leasing of the property to A. & P.   The testimony of Cairns and O'Donnell of A. & P. is particularly important on this point.   Cairns said in part:

"The occasion of my meeting him (plaintiff) in March, 1941, was when he showed me a warehouse

building (Kroger's) that we thought maybe we might be interested in. * * *

"Our company was looking for warehouse space at that time. * * * I had never looked at it previous to Mr. Allen calling it to my attention at that time. * * *

"Blueprints were submitted to me by Mr. Allen, two sets that I know of. * * * Subsequent to March 18, 1941, I requested further information upon this property several times from Mr. Allen. We received that information both verbally and in letter form. * * *

"Now after this first visit to the property in the spring of 1941, I returned to the property. * * * Several times within the next few months. * * *

"Additional information was given to me (by plaintiff) in August of 1941. * * *

"Our company was continuing its search at that time, that is in August, 1941, for warehouse space. * * * We continued our search from that time up until the Green street property (Kroger warehouse) was leased in 1942. * * * Mr. Allen did see me after August 19, 1941, and prior to the spring of 1942. He continued to call at our office. * * * In March of 1942 he did bring information to me concerning this warehouse. He called me on the phone and told me he thought as a matter of courtesy to us he should inform us that he thought there was a possibility of that piece of property being leased * * * and that if we wished to lease it, we had better act fast. As a result of that conversation, I asked him if he would come out to the office. He came. I asked him then to again give me the details, at least up-to-the-minute details, what kind of a lease or agreement they would make on the property. * * * That is when we asked him to put.in letter form the up-to-the-minute deal that he thought we could make. * * *

"That letter (from plaintiff dated March 18, 1942) was received in our office, and after that I took it to

our (vice) president, Mr. O'Donnell. I told him what Mr. Allen had told me, that there may be a possibility of the building being leased to someone else. Then I received instructions from Mr. O'Donnell * * * ˙to meet with Mr. Thierwechter of the Green Realty Company * * * to discuss the possibility of our leasing this property. * * *

"We were told then by Mr. Thierwechter that any negotiations of any lease that were made would be made directly between the Green Realty Company and the A. & P. * * *

"We were only told that the Green Realty Company would work out their problems with the Kroger Company and we would have no dealings with the Kroger Company. * * * A lease was worked out. * * * The negotiations between me and Mr. Thierwechter pertaining to this new lease took place, after Mr. Allen had given me the information that there might be someone else after the property. * * *

˙ "I took the letter received from Mr. Allen to Mr. O'Donnell * * * and told him the conversation that I had had with Mr. Allen. Mr. O'Donnell told me he had been talking with Mr. Thierwechter about that very deal. * * *

"He asked first who Mr. Allen was and I told him he was the gentleman we had been dealing with on this building for some time. * * *

"In the period commencing with March, 1941, and continuing, up to August 19, 1941, the A. & P. company decided that they did not want to lease the Green street warehouse. I advised Mr. O'Donnell that we couldn't use the building. * * *

"At the time that advertisement was being run (about March, 1942), I didn't consider the Kroger company's Green street warehouse suitable for A. & P. purposes. * * * As of March 18th, my recommendation that it was suitable * * * was out of desperation. I suddenly decided on March 18th that the building was suitable because

after the many contacts we had made with real estate agents and the little results we had from our advertising, out of sheer desperation we felt that if there was a possibility of that building being leased, we had better make an effort to get it to protect ourselves. * * *

"I don't recall whether it was Mr. Hayes or myself that called Mr. Allen and told him that we were instructed to negotiate a lease with the Green Realty Company direct. * * * At that time, he told us * * * that that would not affect his dealings with Kroger in any way. * * *

"I changed my mind about the Kroger building over a period of time * * * to the point where I would make a recommendation when I found that there was a possibility that it may be leased to someone else. * * *

"I got that information from one person alone and that was Mr. Allen."

O'Donnell, vice-president in charge of A. & P. operations in that area, testified in part:

"He (Cairns, operating superintendent) was delegated by me six months to a year prior to the leasing of the Green street building to secure adequate space for grocery warehouse. This man (Cairns) presented to me on many occasions various sites which were not approved. * * *

"The result of my visit, or my first visits to this building as far as being interested in it was concerned was negative. We didn't like it. It was not large enough. * * *

"*Q.* What caused you to change your mind about the building being inadequate?

"*A.* It is the old problem of scarcity, supply and demand. * * * We had no further choice but to take the best available at that time which happened to be the Green street. * * *

"*Q.* As I understand the situation then, Mr. O'Donnell, up until the morning that Mr. Cairns

came to you with Mr. Allen's letter you had taken no action upon the Green street property?

"*A.*   *   *   *   I had taken no action until after I had been approached by Mr. Cairns on the seriousness of the situation.   *   *   *

"*Q.*   Had you ever, up to that time that Mr. Cairns came to you on that day with Mr. Allen's letter, ever instructed Mr. Cairns * * * to enter into negotiations with Mr. Thierwechter toward the making of a lease?

"*A.*   Not until that afternoon, after I received word from Mr. Cairns regarding Mr. Allen's letter, or when I read Mr. Allen's letter.

"*Q.*   Can you tell me then who it was that induced you to begin negotiations toward the making of this lease?

"*A.*   Mr. Cairns."

Kroger's agreement of March 19, 1941, to pay plaintiff a commission did not specify an expiration date, but provided that "in the event the deal is consummated, we will assure you of the legal rate of commission for handling the matter." Kroger contends that the agreement terminated by operation of law at the expiration of a reasonable time. Such contention might be sound if the negotiations between Kroger and A. & P. had ended without a lease being made. However, plaintiff, as Kroger's agent, continued his negotiations with A. & P. from March, 1941, until the time A. & P. decided to lease the property in 1942. Kroger neither revoked its agency contract nor in any way indicated denial of plaintiff's authority to represent it. Under the facts and circumstances shown we conclude that Kroger's agreement to pay plaintiff a commission was not terminated by operation of law during the course of the negotiations with A. & P.

Kroger further contends that plaintiff was not the procuring cause of the lease between the realty com-

pany and A. & P., and that he rendered no services which would entitle him to a commission. This contention is answered by the testimony of plaintiff, and of Cairns and O'Donnell, which clearly indicates that plaintiff's efforts were the principal cause of A. & P.'s decision to lease the property. The fact that the negotiations resulted in a direct lease to A. & P. and the discharge of Kroger from further liability, would not defeat plaintiff's right to a commission, because Kroger received as much, if not more, benefit than it would have through a sublease to A. & P. We are convinced that, under the facts shown by the record, Kroger's agreement of March 19, 1941, remained in force and effect, and that plaintiff's services entitled him to the commission claimed.

We have repeatedly said that in cases tried without a jury, the trial judge may give such weight to the testimony as in his opinion it is entitled to. In such cases we do not reverse unless the evidence clearly preponderates in the opposite direction. *Webb* v. *Levene,* 309 Mich. 38; *Hazen* v. *Rockefeller,* 303 Mich. 536; *Eagan* v. *Edwards,* 294 Mich. 260. In the present case there was testimony amply sustaining the finding of the trial court. We find no merit in defendant's contention that the trial court erred in the exclusion of evidence.

The judgment for plaintiff is affirmed, with costs of both courts.

North, C. J., and Wiest, Butzel, Bushnell, Sharpe, Boyles, and Reid, JJ., concurred.